UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILIA B. GONZALES,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>Defendant. | Case No. 14-cv-00489-VC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; REMANDING FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 13, 14 |

Plaintiff Emilia Gonzales brings this action for judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act. The parties have filed cross-motions for summary judgment. Gonzales's motion is granted in part. The defendant's motion is denied.

## BACKGROUND

Gonzales is a native and citizen of Mexico, lawfully admitted for permanent residence to the United States. A 53-year old mother of four daughters, Gonzales worked as a janitor at a church from 1990 until 2004, when she lost her job after back and shoulder injuries left her unable to perform her duties. Tr. 21, 73. Gonzales has not worked since losing this job.

In October 2010, Gonzales filed an application for disability benefits, claiming she had been disabled since 2004. She subsequently amended her claimed disability onset date to December 1, 2009. Tr. 119. After Gonzales's claim was denied by the Social Security Administration, she requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing in May 2012. In a decision dated June 13, 2012 the ALJ determined that Gonzales was not disabled based on the five-step sequential evaluation process mandated by Social Security Regulations. *See* 20 C.F.R. § 404.1520.

The five steps of the inquiry are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). "The claimant has the burden of proof for steps one through four, and the Commissioner has the burden of proof for step five. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry." *Id*. at 953–54 (citations omitted)

The ALJ found Gonzales: (1) was not performing substantial gainful activity; (2) has a medically determinable severe impairment; but (3) did not have an impairment or combination of impairments that meets, or equals the severity of, one of the listed impairments. Before proceeding to steps four and five, the ALJ found Gonzalez to have the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), albeit further limited in the following manner: "she can do no overhead reaching, bilaterally; can only occasionally stoop or climb ladders; can frequently climb stairs and ramps, balance, kneel, and crouch; but cannot crawl." Tr. 123. At step four, the ALJ determined that Gonzalez could perform her past relevant work as a janitor. Alternatively, at step five, the ALJ found, based on Gonzales's residual functional capacity, age, education, and language skills, that she is also able to perform a significant number of other jobs in the national economy. Tr. 129–30. Based on these

findings at steps four and five, the ALJ concluded that Gonzales was not disabled under the Social Security Act.

Following the ALJ's unfavorable decision, Gonzales filed a request for review by the Appeals Council. In January 2014, the Appeals Council determined that there was no reason to review the ALJ's decision, and that decision became the final decision of the Commissioner. Gonzales then brought this action for judicial review pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Court may set aside the Commissioner's denial of disability benefits "if it is not supported by substantial evidence or it is based on legal error." *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986) (citation omitted). Substantial evidence is "'such relevant evidence which a reasonable person might accept as adequate to support a conclusion.'" *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 402 (1971)). In reviewing the ALJ's decision, the Court must "consider the record as a whole weighing both the evidence that supports and the evidence that detracts from the Secretary's conclusion." *See id.* at 576. And absent legal error, Court must "uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *See Magallanes v. Brown*, 881 F.2d 747, 750 (9th Cir. 1989).

## DISCUSSION

Gonzales contends the ALJ's conclusions about her eligibility for benefits were not supported by substantial evidence because the ALJ rejected or ignored the opinions of treating and consulting physicians without providing specific, legitimate reasons, and because the ALJ's decision relied on a vocational expert's response to a hypothetical posed by the ALJ that did not accurately reflect Gonzales's limitations. The Court agrees on both points.

**1. Medical History**

Gonzales's back and shoulder pain dates back to at least 2002, when she suffered separate injuries to her left shoulder and her lumbar spine, both in the course of her employment. Tr. 343–45. Following the injury to her back, Gonzales complained of back pain and bilateral leg numbness. An MRI examination of her spine in May 2002 showed a posterior disc bulge.

3

1    Gonzales was treated conservatively from June through October 2002 with oral medication and
2    physical therapy. Tr. 124. An MRI of Gonzales's cervical spine in 2003 showed mild neural
3    "foraminal narrowing" at her C6–7 vertebra and suggested that an "uncovertebral spur" was
4    "compromising" Gonzales's C5–6 "neural formen." Tr. 437.  Also in 2003, nerve conduction
5    studies showed that Gonzales's nerve conduction was "abnormal and consistent with . . . loss of
6    some motor nerve fibers . . . and sensory neuropathy." Tr. 124.

In January 2004, Gonzales saw Dr. Paul Sandhu for comprehensive pain management. She complained of pain in her neck, shoulder, back, and wrist. An examination showed a reduced range of motion in Gonzales's neck and left shoulder, accompanied by pain and decreased sensation. Tr. 124. Dr. Sandhu diagnosed "cervical myofascial pain; greater occipital neuralgia (left greater than right); left carpal tunnel syndrome; left medial/lateral epicondylisis, and left shoulder impingement." *Id.*

In May 2004, Gonzales's primary treating physician, Eduardo Cornejo, D.C., completed a Permanent Disability Report in which he opined that Gonzales could not lift more than five pounds without moderate to severe pain. He precluded Gonzales from: (1) lifting or carrying for any more than five minutes; (2) repetitive spine flexion; and (3) overhead work with her left arm. Tr. 124.

In April 2005, Gonzales was examined by Edward Cremata, another chiropractor, as part of a worker's compensation claim arising from Gonzales's work-related injuries. Dr. Cremata precluded Gonzales from any heavy work or repetitive motions of her neck. Tr. 125. He also found that Gonzales had lost 30 to 40 percent of her pre-injury capacity for working with her arms overhead, 30 percent of her pre-injury capacity for pushing, pulling, lifting, and carrying with her upper extremities, 30 percent of her pre-injury capacity for prolonged sitting, and 25 percent of her pre-injury capacity for prolonged standing or walking. Tr. 462.

In July 2007, Dr. Robert Aptekar treated Gonzales for her left shoulder injury. He diagnosed "impingement syndrome with adhesive capsulitis," and performed a number of surgical procedures in an attempt alleviate her shoulder pain. Tr. 125. However, these procedures were ultimately unsuccessful in resolving Gonzales's shoulder problems. *See* Tr. 548 (describing

4

1  Gonzales's shoulder problems four years later as being consistent with "failed rotator cuff
2  surgery").
3        In January 2007, and again in September 2008, Dr. Arthur Auerbach examined Gonzales
4  in the context of her worker's compensation claim.  Dr. Auerbach diagnosed "chronic lumbar
5  strain with a probable degree of low lumbar mild degenerative disease," and "continued chronic
6  left shoulder residuals of left shoulder pain syndrome, adhesive capsulitis, and impingement
7  syndrome."  Tr. 125.  Presumably because Gonzales's work-related injuries were only to her
8  shoulder and lower back, Dr. Auerbach offered no diagnosis as to Gonzales's neck pain.
9        In October 2008, Dr. Aptekar wrote that the symptoms of Gonzales's shoulder
10 impingement syndrome were "moderate" in severity.  He stated that Gonzales needed to avoid
11 overhead work bilaterally, and that she was limited in her ability to push, pull and lift with her left
12 arm.  Tr. 126.
13        In December 2011, approximately two months after Gonzales filed her application for
14 benefits, Dr. Calvin Pon examined Gonzales at the request of the Social Security Administration.
15 Dr. Pon diagnosed as follows:

   1. Chronic neck pain, possible cervical disc disease with degenerative changes of the cervical spine;
   2. Status post arthroscopic surgery to the left shoulder, now with chronic residual left shoulder pain and probable degenerative changes;
   3. Chronic low back pain, possible lumbar disc disease with degenerative changes.  Although the claimant complained of bilateral lower extremity pain and numbness, there was no objective evidence of a lumbosacral nerve root impingement.
   4. Chronic bilateral hand pain and numbness; possible carpal tunnel syndrome.

22 Tr. 126.

   Dr. Pon opined that Gonzales could stand and walk for six hours of an eight-hour day;
   could sit for six hours of an eight-hour day; could occasionally stoop, crawl, crouch, kneel, squat,
   and climb ladders; could frequently perform bilateral pushing and pulling, could frequently carry
   ten pounds and occasionally carry twenty pounds.  He found that Gonzales had no limits on her
   ability to reach with her right arm, but stated she should only occasionally reach with her left arm.

Tr. 127.

In April 2011, Dr. Michael Krosin, an orthopedic specialist working at Highland Hospital, where Gonzales had been receiving ongoing treatment, examined Gonzales in connection with her shoulder, arm, and neck pain. He found that Gonzales had a limited range of motion on her left side and decreased strength bilaterally, though more severe on the left side. Tr. 547–48. Dr. Krosin diagnosed failed rotator cuff surgery and "diffuse weakness of unknown etiology." He stated that he believed that there was a "chronic pain component" to Gonzales's complaints, but nonetheless concluded that Gonzales's weakness, decreased range of motion, and neck and wrist pain would make it difficult for her to perform repetitive tasks or lift more than five pounds. He ordered neck x-rays to assess whether Gonzales's neck arthritis had worsened, and planned to follow up over time to determine whether Gonzales's condition was worsening or had stabilized. Tr. 549.

Dr. Krosin examined Gonzales again in March 2012. He noted that MRI and x-ray imaging had "not reveal[ed] any sort of pathology," and concluded that, "at this point in tim[e] it is safe to say that the patient is dealing more with chronic pain probl[em than] any single orthopedic entity." Tr. 547. He stated he would send Gonzales back to her primary care physician to deal with the chronic pain. He also opined that Gonzales' chronic pain was preventing her from meaningful work, and that she might be a candidate for disability insurance benefits. *Id.*

### 2. ALJ's Evaluation of the Medical Evidence

The ALJ stated that she gave "great weight" to the opinions of Dr. Aptekar and Dr. Auerbach "because they reviewed all of the medical evidence of record from all treating and examining sources as well as radiographic and diagnostic test results, examined the claimant, and are specialists in the fields of both orthopedics and evaluating work related medical impairments." Tr. 126. As for Dr. Krosin's 2012 report, it appears the ALJ mistook it as having been written by a separate physician, who the ALJ referred to as Dr. Michael Acosta. The ALJ gave this report no weight based on the fact that Dr. "Acosta" reported that he had treated Gonzales for "only one year when he assessed her in April 2012." Tr. 126. The ALJ also found that the restrictions Dr. "Acosta" placed on Gonzales' activity were "overly restrictive, given the fact that most of the

1  treatment notes are for routine health care, such as allergies, weight, blood pressure, and some
2  chronic pain of the shoulder, neck, and back." *Id.* In a separate paragraph, the ALJ noted that
3  Gonzales had been examined by Dr. Krosin in 2011. Although the ALJ apparently viewed Dr.
4  Krosin as a separate treating physician from Dr. "Acosta," the ALJ made no findings as to the
5  weight accorded to Dr. Krosin's 2011 report.

6  The ALJ also noted inconsistencies between Gonzales's statements to two different
7  examining doctors. In December 2010, Gonzales had told Dr. Pon that she needed some
8  assistance in getting dressed, but could cook and prepare her own meals, drive, and put gasoline in
9  her car, but was unable to wash dishes, take out the garbage, do laundry, vacuum, or sweep or mop
10  the floor. That same month, Gonzales told Dr. Ute Kollath, a psychological consultative
11  examiner, that she was independent for basic activities of daily living, did not need help preparing
12  meals, was able to drive, and typically spends her day with chores around the house. The ALJ
13  concluded that Gonzales's statements to Dr. Kollath amounted to a denial of any physical
14  limitations as a result of her medical problems, and that this inconsistency diminished Gonzales's
15  overall credibility. Tr. 127.

16  Gonzales argues that, instead of according Dr. Krosin's opinion the additional weight to
17  which a treating source is entitled under Social Security regulations, the ALJ improperly
18  discounted Dr. Krosin's testimony based on the length of his treatment of Gonzales and the fact
19  that many of the treatment notes from Gonzales's treatment at Highland Hospital referred to
20  routine health care. "As a general rule, more weight should be given to the opinion of a treating
21  source than to the opinion of doctors who do not treat the claimant." *Turner v. Comm'r of Soc.*
22  *Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010). "Where the treating doctor's opinion is not contradicted
23  by another doctor, it may be rejected only for 'clear and convincing' reasons supported by
24  substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting
25  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Even where "the treating doctor's opinion
26  is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific
27  and legitimate reasons'" for doing so. *Id.* (quoting *Reddick*, 157 F.3d at 725). Therefore, "[t]o
28  reject the opinion of a treating physician in favor of a conflicting opinion of an examining

7

physician[,] an ALJ . . . must make[] findings setting forth specific, legitimate reasons . . . that are based on substantial evidence in the record." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (internal quotation marks omitted).

> The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating h[er] interpretation thereof, and making findings. The ALJ must do more than offer h[er] conclusions. [Sh]e must set forth h[er] own interpretations and explain why they, rather than the doctors', are correct.

*Orn*, 495 F.3d at 632 (quoting *Reddick*, 157 F.3d at 725) (citations omitted).

Whether or not Dr. Krosin's opinion is entitled to the additional weight of a treating source, the ALJ failed to provide adequate reasons for rejecting entirely Dr. Krosin's diagnosis. Social Security regulations provide that the Social Security Administration "*may* consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." 20 C.F.R. § 404.1502 (emphasis added). Thus, the opinion of a physician who has treated a patient only a few times, or after long intervals, may not *always* be entitled to the extra weight ordinarily accorded to a treating source. But because the ALJ mistook one of Dr. Krosin's evaluations as coming from a different doctor, the ALJ was unable to properly evaluate whether Dr. Krosin should be considered a treating source.

Further, as Gonzales points out, Dr. Krosin was treating Gonzales in conjunction with her primary care physician, and by the time of Dr. Krosin's first examination in April 2011, Gonzales had been receiving ongoing treatment from physicians at Highland Hospital for some time. *See Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003) (explaining that the opinion of a physician who treats a patient only once may nonetheless properly be considered a treating source where that opinion represents both the author's personal knowledge of a patient's condition and the knowledge communicated to that physician by other members of a team of treating physicians). Indeed, the fact that Gonzales was receiving ongoing treatment from a team of physicians at Highland also explains why the treatment notes from the hospital would also include a number of references to routine healthcare treatment.

8

1       What's more, Social Security regulations nowhere provide that the opinion of a physician may be disregarded completely based on the fact that he or she has only treated the patient a few times. To the contrary, even if Dr. Krosin were not considered a treating source, there is no question that he is an "acceptable medical source" within the meaning of the regulations. *See* 20 C.F.R. § 404.1513. Thus, even if, based on the duration of Dr. Krosin's treatment of Gonzales, Dr. Krosin's opinion was not entitled to the additional weight accorded to a treating source, that would not mean that his opinion was entitled to no weight whatsoever. *See Orn*, 495 F.3d at 631–32 (explaining that, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." (internal quotation marks omitted)). And given that Dr. Pon examined Gonzales on only one occasion, it made little sense to reject entirely Dr. Krosin's opinion in favor of Dr. Pon's based primarily on the fact that Dr. Krosin had treated Gonzales for only one year.

The ALJ also appeared to entirely discount Dr. Cornejo's report. The ALJ noted that because Dr. Cornejo is a chiropractor, his opinion is not considered an acceptable source for establishing a diagnosis for Social Security purposes. Tr. 125; *see* 20 C.F.R. § 404.1513(a). But an ALJ "may" consider the opinion of an "other" medical source, such as a chiropractor, to determine the *severity* of an impairment. 20 C.F.R. § 404.1513(d)(1). And 20 C.F.R. § 404.1527(d) provides that, "regardless of source," the Social Security Administration "*will* evaluate every medical opinion [it] receive[s]." (Emphasis added.) Thus, while Dr. Cornejo's report may not have provided a basis for establishing a diagnosis, it appears that the ALJ was nonetheless obliged to evaluate Dr. Cornejo's report as evidence of the severity of Gonzales' symptoms.

Finally, the ALJ mischaracterized certain medical evidence. For example, Dr. Auerbach reported "give-way sensation secondary to pain of all motions of the left shoulder and left elbow against resistance." Tr. 125. The ALJ concluded that "this indicates a lack of good effort by the claimant." *Id.* But the ALJ does not explain why a "give-way sensation secondary to pain" would "indicate[] a lack of good effort." Nothing in Dr. Auerbach's notes suggests that the doctor himself believed that Gonzales was not making a "good effort" during the examination.

9

### 3. ALJ's Hypothetical to the Vocational Expert

> At the fifth step of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not disabled and can engage in work that exists in significant numbers in the national economy. The ALJ may meet [t]his burden . . . by asking a vocational expert a hypothetical question based on medical assumptions supported by substantial evidence in the record . . . .

*Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012) (citations omitted).

Here, the hypothetical that the ALJ posed to the vocational expert was defective. Even considering only the opinions of the physicians to which the ALJ accorded controlling weight, the ALJ's hypothetical failed to set out all the limitations and restrictions that those physicians established for Gonzales. *See Valentine*, 574 F.3d at 690. In particular, the ALJ's hypothetical failed to recognize that Drs. Aptekar and Pon both diagnosed limits on Gonzales' ability to use her left arm beyond overhead reaching. Dr. Aptekar, whose opinion the ALJ claimed to have given "great weight," stated that Gonzales was limited in her ability to push, pull and lift with her left arm. Tr. 126. And Dr. Pon stated that Gonzales should be limited to occasional reaching with her left shoulder, with "symptomatic limitations" in her range of motion with that shoulder. Tr. 172. Dr. Pon also stated that "[c]rouching, kneeling, and squatting should be limited to occasionally." *Id.* Yet, in the hypothetical she posed to the vocational expert, the ALJ described Gonzales's physical limitations as follows: "This is a right hand dominant individual who cannot do bilateral overhead reaching, can occasionally climb ladders, stoop, can frequently climb stairs and ramps, frequently balance, kneel and crouch but cannot crawl." Tr. 39. When the vocational expert asked a follow-up question about Gonzales's reaching ability, the ALJ responded that Gonzales was able to reach straight out or at shoulder level, and that the only limitation was "bilateral overhead reaching." *Id.*

Clearly, this hypothetical did not take into account the limitations that both doctors recognized on Gonzales's ability to use her left arm. Nor did it reflect Dr. Pon's limitation on crouching, or kneeling. The ALJ did pose a second hypothetical in which everything from the first hypothetical remained constant except that Gonzales was also "limited to occasional reaching in all directions with her non-dominant left arm." But this second hypothetical still did not fully reflect

Dr. Aptekar's statement that, beyond limitations on reaching, Gonzales was also limited in her ability to push and pull with her left arm.  And in any event the ALJ did not rely on this second hypothetical in coming to a final decision.  In response to this hypothetical, the vocational expert stated that this additional limitation on Gonzales's abilities would preclude her from working in her past position at any exertional level.  Tr. 40.  But at step four of the ALJ's evaluation, the ALJ determined that Gonzalez could perform her past relevant work as a janitor.  Tr. 129.  Because the hypothetical posed to the vocational expert failed to identify all Gonzales's impairments, "the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings." *Hill*, 698 F.3d at 1162 (internal quotation marks omitted).

## CONCLUSION

Given the flaws evident in the ALJ's decision, the Court finds that the decision to deny benefits was not supported by substantial evidence.  Accordingly, Gonzales's motion is granted in part.  Because the Court is unable, from this record, to definitively conclude that Gonzalez is eligible for benefits, the Court remands for a redetermination of Gonzales's eligibility.  *See Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014).

**IT IS SO ORDERED**.

Dated:  December 10, 2014

VINCE CHHABRIA
United States District Judge